UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

REBECCA SYDNEY MILLER,

                        Plaintiff,        **No. 6:16-cv-06467(MAT)**
                                          **DECISION AND ORDER**

            -vs-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                        Defendant.

─────────────────────────────

## INTRODUCTION

Represented by counsel, Rebecca Sydney Miller ("Plaintiff") instituted this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## PROCEDURAL STATUS

Plaintiff protectively filed an application for DIB on August 23, 2012, alleging disability as of February 28, 2010, due to depression, colon prolapse, chronic diarrhea, and malnutrition. The claim was denied initially, and Plaintiff filed a written request for a hearing. On July 18, 2014, a hearing was conducted by administrative law judge Connor J. O'Brien ("the ALJ") in Rochester, New York. (T.33-85).[1] Plaintiff appeared with her

---

[1] Citations to "T." in parentheses refer to pages from the transcript of the certified administrative record.

attorney and testified, as did impartial vocational expert Julie A. Andrews ("the VE"). The ALJ issued an unfavorable decision on October 30, 2014. (T.15-28). The Appeals Council denied Plaintiff's request for review on May 10, 2016, making the ALJ's decision the final decision of the Commissioner. Plaintiff then timely commenced this action.

Plaintiff filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Defendant filed a cross-motion under Rule 12(c). No replies were filed. The Court adopts and incorporates by reference herein the undisputed and comprehensive factual summaries contained in the parties' briefs. The Court will discuss the record evidence further below, as necessary to the resolution of the parties' contentions.

For the reasons discussed below, the Commissioner's decision is affirmed.

## THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation established by the Commissioner for adjudicating disability claims. See 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2015, and has not engaged in substantial gainful activity ("SGA") since the alleged onset date. Plaintiff testified that she has been working 20 hours a week at a cigar shop, which the ALJ found does not meet the earnings threshold for SGA. (T.20).

At step two, the ALJ determined that Plaintiff has the following "severe" impairments: depression, anxiety, chronic irritable bowel syndrome ("IBS"), and history of rectal prolapse. (T.20).

At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Pt. 404, Subpt. P, App. 1 ("the Listings"). (T.20). The ALJ gave particular consideration to Listing 12.04 (Affective disorders) and Listing 12.06 (Anxiety disorders) and found that Plaintiff has "mild restriction" in activities of daily living; "moderate difficulties" in social functioning; "moderate difficulties" in maintaining concentration, persistence, or pace; and had not experienced any episodes of decompensation. (T.21). Therefore, the "paragraph B" criteria of Listings 12.04 and 12.06 were not met. The ALJ also found that the "paragraph C" of these listed impairments were not met. (Id.).

The ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform light work, with the following limitations:

> she can tolerate occasional exposure to hazards and occasional changes in work setting. She can work to meet daily goals, but [can]not maintain an hourly, machine-driven, assembly line production rate. She requires up to three short, unscheduled, less-than-5-minute breaks in addition to the regularly scheduled breaks. She can interact with the public at Dictionary of Occupational Titles (DOT) people function levels 6 (speaking/signaling), 7 (serving), and/or 8

(helping/taking instructions). She cannot engage in teamwork. She is restricted to unskilled work, and is only occasionally able to make work-related decisions or judgments.

(T.22).

At step four, the ALJ found that Plaintiff had past relevant work ("PRW") as a lab assistant; scientific helper; research assistant II; laboratory animal facility supervisor; material handler; machine packager; sterilizer; eye glass/contact inspector; and data entry clerk. (T.26). Given Plaintiff's RFC, the ALJ found her unable to perform the demands of her PRW since all jobs either exceeded her current physical exertional capability, or were skilled or semi-skilled level.

At step five, the ALJ noted that Plaintiff was a "younger individual age 18-49" (41 years-old on the onset date), with at least a high school education (she has a bachelor's degree in biological sciences). The ALJ relied on the VE's testimony to find that Plaintiff could perform the requirements of representative occupations such as housekeeper cleaner (DOT 323.687-014, SVP 2, light, 1.1 million jobs in the national economy); and mail clerk (DOT 209.687-026, SVP 2, light, 164,563 jobs in the national economy). (T.27-28). Accordingly, the ALJ entered a finding of not disabled. (T.28).

## SCOPE OF REVIEW

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is

limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

### I.  RFC Not Supported by Substantial Evidence

#### A.  Erroneous Weighing of Opinions from Treatment Providers

Plaintiff argues that if the ALJ had properly weighed the medical opinion evidence, the only possible conclusion is that Plaintiff is disabled based on her difficulty in dealing with stress. According to Plaintiff, even low-stress work does not account for her severe limitations in dealing with stress. In support of this argument, Plaintiff cites the reports issued by the consultative psychologist and her therapist.

### 1. Consultative Psychologist Dr. Christine Ransom

On November 12, 2012, Dr. Ransom conducted a consultative examination of Plaintiff at the Commissioner's request. Plaintiff presented as cooperative and socially appropriate, and had average intellectual functioning, coherent and goal directed thought processes, and good insight and good judgment. (T.395, 396-97). However, she also had lethargic motor behavior, downcast eyes, slow and halting speech, a moderately to markedly dysphoric mood and affect, moderately impaired attention and concentration, and moderately impaired memory. (T.396). For her medical source statement, Dr. Ransom opined that Plaintiff had "moderate" difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule and learning simple new tasks; and would have "moderate to marked" difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress. (T.396). The ALJ gave "some" weight to Dr. Ransom's opinion but found the more restrictive portions to be unpersuasive because they were inconsistent with treating source records showing relatively benign examination findings and Plaintiff's own activities. (T.25). It was permissible for the ALJ to credit portions, but not all, of the consultative psychologist's report since "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citation omitted).

As discussed below, the ALJ's weighing of Dr. Ransom's opinion was supported by substantial evidence. See id. ("The record plainly contained conflicting psychological evaluations of Veino's present condition, and it was within the province of the ALJ to resolve that evidence in the way she did."); see also Barry v. Colvin, 606 F. App'x 621, 624 (2d Cir. 2015) (summary order) (similar).

After reviewing the entire record, it is apparent that at the time of her consultative examination with Dr. Ransom in November of 2012, Plaintiff was at a particularly low point in her depression. She had recently suffered the loss of her father due to pneumonia, and she informed Dr. Ransom that her depression had worsened that year as a result. (T.394). In addition, she was on a sub-therapeutic dosage of antidepressant, which was discovered after she obtained a psychiatric referral to Unity Mental Health Services from her primary care physician Dr. Bharat Gupta. (T.424). On August 6, 2013, Plaintiff had a screening appointment with Licensed Clinical Social Worker ("LCSW") Mary Ann Wilson at Unity Mental Health Services. (T.442). On October 14, 2013, Dr. Nusrat Shafiq, a psychiatrist at Unity, evaluated Plaintiff (T.450-54), and observed that she a sad mood and affect, and thoughts of helplessness, appropriate behavior, unremarkable motor movements, average eye contact, normal speech, logical and coherent thought form, normal perceptions, good insight, good judgment, and no apparent cognitive deficits. (T.453-54). Dr. Shafiq diagnosed

Plaintiff with depressive disorder and anxiety disorder[2] and recommended an increased dosage of Effexor. (T.450). However, because Plaintiff obtained her medication through a patient-assistance program, the prescription itself had to come from Dr. Gupta's office. (T.429). On November 5, 2013, Dr. Gupta increased Plaintiff's Effexor dosage as recommended by Dr. Shafiq.

The medical records and treatment notes that post-date Dr. Ransom's November 2012 consultative report reveal a general trend of improvement in Plaintiff's depressive symptoms. On December 5, 2013, Plaintiff reported to Dr. Gupta that she felt better, was calm, and was able to sleep better. (T.433). On examination, Dr. Gupta found that Plaintiff had an appropriate mood and affect, normal insight and normal judgment. (T.435). Dr. Gupta noted that her depression was improving. (T.433). On January 9, 2014, Plaintiff reported to Dr. Gupta that her medication "is working" and she "feels her life is better." (T.437). Plaintiff saw Psychiatric Nurse Practitioner ("PNP") Carol Coy on April 1, 2014, for medication management, and reported that she was experiencing relationship problems and had suffered a miscarriage. She was having "intermittent" thoughts of suicide but had no plan, and PNP Coy did not consider her to be an imminent risk for self-harm.

---

[2] On initial screening, LCSW Wilson also indicated "rule out" diagnoses of personality disorder post-traumatic stress disorder (PTSD), but these diagnoses were never confirmed.

(T.457-58).[3] She explained that she liked her job at a cigar shop though she was having trouble remembering things. She was meeting with a therapist, and finding that helpful. (T.458). PNP Coy increased Plaintiff's Effexor dosage.

On April 23, 2014, Licensed Mental Health Counselor ("LMHC") Elena Pilato indicated that Plaintiff had been making "fair progress" over their six sessions, was insightful, and was actively engaged in therapy. (T.462). Plaintiff told LMHC Pilato that she enjoyed her job at the cigar shop and found it fulfilling. (T.462).

The record does indicates that Plaintiff experienced a worsening of her depression, but this was caused by her being switched from brand-name Effexor to venlafaxine, a generic version of that drug. (See T.512). On May 20, 2014, Plaintiff reported to LMHC Pilato that she had "noticed such a difference in her mood since being on generic Effexor." (Id.). By the time of her next appointment with LMHC Pilato on May 30, 2014, Plaintiff had obtained brand-name Effexor and reported that her mood had "improved already being on non-generic Effexor." (T.515). Plaintiff reported that she felt more stable and in control, and was still enjoying her job at the tobacconist. On June 5, 2014, Plaintiff saw her psychiatrist, Dr. Shafiq, and informed him that she felt better since being on the non-generic Effexor, was eating and sleeping well, was "not crying anymore for no reason," and was able to deal

---

[3]
Subsequent records do not contain references by Plaintiff to suicidal ideation or other thoughts of self-harm.

with her multiple life stressors. (T.518). On June 19, 2014, at her therapy appointment with LMHC Pilato, Plaintiff presented with an elevated mood and affect despite dealing with a major life stressor, namely, her brother being hospitalized due to advanced alcoholism. (T.524-25).

The record contains additional mental health treatment notes and reports submitted to the Appeals Council, covering June 26, 2014, through October 30, 2014, the date of the ALJ's decision. On June 26, 2014, Plaintiff was "more upbeat and talkative" despite being worried about her brother's health problems and struggle with alcoholism. She reported her romantic relationship with her boyfriend was still going well. (T.529). On July 17, 2014, Plaintiff discussed with LMHC Pilato how "happy and great" her relationship with her boyfriend was. (T.532). On August 28, 2014, Plaintiff reported that she was going to a cabin in the Adirondacks with some friends and that everything was going well at her job. (T.544). Plaintiff saw her new psychiatrist, Dr. Raja Rao, on September 30, 2014, who described her depressive symptoms as "mild" and noted that her mood was euthymic. (T.560). On October 1, 2014, Plaintiff reported to her therapist that she had been working harder and taking on more responsibilities at the tobacconist. She liked the added responsibilities and said she would enjoy working as a supervisor if that job were offered to her. (T.556). Plaintiff also noted that her stomach issues and other physical problems had improved since being fitted with an IUD. (Id.). On October 29,

-10-

2014, Plaintiff reiterated to LMHC Pilato that work was going well, and that she "really enjoyed" working at the tobacco shop. (T.565). Plaintiff noted that her "only current concern" was her sadness about her brother's recent death, and how she missed him. (Id.). On November 5, 2014, Plaintiff reported that things were going well with her boyfriend. She was continuing to grieve her brother's death. On December 11, 2014, Plaintiff said that things were going well at work, and she recently had received a raise. (T.577). On December 23, 2014, Plaintiff reported to Dr. Rao that the sadness in the pit of her stomach was gone; she was "happy" and "content". (T.580). Dr. Rao described her mood as euthymic. (T.581). On December 30, 2014, Plaintiff told LMHC Pilato that she was "so happy" about her relationship with her boyfriend and that the "despair" she had been feeling was "gone." She reported being able to deal better with the loss of her brother. (T.584). These records also reflect a continued trend of improvement in Plaintiff's depressive symptoms, notwithstanding the presence of various life stressors, including her brother's untimely death.

Finally, the Court notes that Dr. Ransom's opinion does not necessarily mandate a conclusion of disability due to the complete inability to deal with stress. Other courts in this Circuit have affirmed decisions denying benefits in cases where the record contains an opinion that the claimant has a "marked" limitation in performing a work-related function, such as found by Dr. Ransom. See, e.g., Humes v. Colvin, 3:14-CV-0512, 2016 WL 1417823, at *2

(N.D.N.Y. Apr. 11, 2016) (no error in Report and Recommendation finding that a "marked" limitation in lifting, carrying, bending or squatting assigned by consultative physician was not inconsistent with State agency medical consultant that claimant could perform light work); Fiducia v. Comm'r of Soc. Sec., No. 1:13-CV-285, 2015 WL 4078192, at *4 (N.D.N.Y. July 2, 2015) ("The fact that [claimant] was found to have a marked limitation interacting with others does not conclusively demonstrate that she is unable to work, particularly given the fact that the ALJ limited [her] to work that does not require more than occasional interaction with the public and co-workers.").

### 2. Therapist Elena Pilato, LMHC

On May 16, 2014, LMHC Pilato completed a mental RFC questionnaire (T.501-06), opining that Plaintiff could understand, remember and carry out very short and simple instructions; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; interact appropriately with the general public; and be aware of normal hazards and appropriate precautions. (T.503-04). LMHC Pilato assessed that, for less than 10 percent of an 8-hour work day (i.e., less than 48 minutes), Plaintiff's symptoms would interfere with her ability to understand and remember work-like procedures, maintain attention and concentration for two-hour segments; work in coordination with or proximity to others without

being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a routine work setting. (T.503-04). From 11 percent to 20 percent of an 8-hour work day (i.e., from 52.8 minutes to 96 minutes), Plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms and deal with normal work stress. (Id.). According to LMHC Pilato, Plaintiff would be off-task more than 30 percent of the time due to her symptoms, and could not work more than part-time or per diem. (T.504). The ALJ assigned "some weight" to LMHC Pilato's mental RFC questionnaire. (T.25-26).

Under the Commissioner's Regulations, LMHC Pilato is not an "acceptable medical source," but instead is considered an "other source." See SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). While the Commissioner "may use evidence from 'other sources,'" id., only "acceptable medical sources" can be considered treating sources, whose medical opinions may be entitled to controlling weight. Id. (citations omitted).

Plaintiff faults the ALJ for declining to accept LMHC Pilato's opinion that she could only work part-time or per diem. (T.26). The ALJ reasoned, based on other evidence in the record, that Plaintiff could perform some jobs full-time if they had lower demands.

(T.26). Plaintiff's testimony supports this aspect of the RFC assessment. At the hearing, Plaintiff explained that she left her last full-time job as a cancer researcher and laboratory manager because of a loss of funding in her research laboratory at the University of Michigan, rather than because of her medical conditions (including issues with stress). (T.42). Upon moving to western New York, she declined a research job at the University of Rochester because the salary offered was too low—not because she could not cope with the demands of the position based on her stress and other medical conditions. (T.45). As Defendant argues, the fact that Plaintiff stopped working full-time due to issues unrelated to her impairments undermines LMHC Pilato's conclusion that Plaintiff is incapable of full-time work.

Furthermore, the Court notes that LMHC Pilato's restrictive RFC questionnaire was completed on May 16, 2014, at the same time that Plaintiff was experiencing a significant exacerbation of her symptoms due to her medication being switched from the brand-name to the generic version. As noted in the foregoing section, on May 20, 2014, Plaintiff reported to LMHC Pilato that she had noticed a significant difference in her mood since being on generic Effexor; she was much more irritable and depressed. Furthermore, as set forth above, LMHC Pilato's treatment notes reflect an overall improvement in Plaintiff's depression and anxiety as a result of her compliance with her medication regimen and consistent participation in therapy. The ALJ's decision to accord only "some

weight" to LMHC Pilato's opinion was not legally erroneous and was
supported by substantial evidence.

## B.  Failure to Account for Plaintiff's Limitations in Dealing with Stress

Plaintiff argues that the RFC is not supported by substantial
evidence because the ALJ failed to fully address what she
characterizes as the "marked and preclusive" limitation in dealing
with stress found by Dr. Ransom. Plaintiff asserts that the ALJ's
inclusion of a "5-minute break" is not adequate to account for
these difficulties in handling stress.

The Commissioner recognizes that "[s]ince mental illness is
defined and characterized by maladaptive behavior, it is not
unusual that the mentally impaired have difficulty accommodating to
the demands of work and work-like settings." SSR 85-15, 1985 WL
56857, at *5 (S.S.A. 1985). Routine or trivial demands in the
workplace, such as "having their performance supervised, and
remaining in the workplace for a full day," can cause mentally
impaired claimants to "cease to function effectively." Id. at *6.
Indeed, "the reaction to the demands of work (stress) is highly
individualized[,]" id. However, as Defendant argues, the ALJ
included additional limitations in the RFC formulation designed to
address Plaintiff's difficulties in handling work-related stress.
For instance, the ALJ restricted Plaintiff to unskilled jobs that
involve only occasional changes in the work environment, that
require her to make only occasional work-related decisions and

judgments, and do not entail teamwork or collaboration. (T.22). By definition, unskilled work requires little or no judgment to do simple duties that can be learned on the job in a short period of time, and requires working primarily with objects, rather than data or people. See SSR 85-15, 1985 WL 56857, at *4. The ALJ also restricted Plaintiff to work that does not require her to meet hourly production rates, such machine-driven assembly-line work. (T.22).

Furthermore, as discussed above, Dr. Ransom's report does not, on its face, indicate Plaintiff cannot handle any stress at all. As also discussed above, courts have found that opinions assigning "marked" limitations in various work-related functions do not conclusively demonstrate that a claimant is unable to work. See Fiducia, 2015 WL 4078192, at *4 ("[T]he assessment completed by Dr. Wasfi and Ms. Graham did not find extreme limitations in any category which would have meant that they believed plaintiff had 'no useful ability to function in this area.' Instead, the assessment found that plaintiff had a marked limitation with respect to interacting with others-that she had a 'substantial loss in the ability to effectively function.'"). Even if Plaintiff "were found to have extreme limitations, and to be unable to work by her healthcare providers, this determination would not be controlling." Id. (citing Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("The 'ultimate finding of whether a claimant is disabled and cannot work

. . . [is] reserved to the Commissioner.' ") (internal quotation marks and citation omitted); other citations omitted).

## II. Erroneous Severity Finding at Step Two

Plaintiff also argues that the ALJ should have found her past diagnosis of cancer, foot neuroma, thumb arthritis, attention deficit hyperactivity disorder ("ADHD"), and post-traumatic stress disorder ("PTSD") to be "severe" impairments at step two of the sequential evaluation. As discussed below, the Court finds that the ALJ's step two finding was correct.

A claimant has the burden of establishing that she has a "severe impairment," which is "any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work." 20 C.F.R. § 404.1520(c). Green-Younger, 335 F.3d at 106; see also SSR 85-28, 1985 WL 56856, at *3 (S.S.A. 1985). Basic work-related physical activities include walking, standing, sitting, reaching, carrying, hearing, seeing, and speaking. See SSR 85-28, 1985 WL 56856, at *3. Basic work-related mental abilities include understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, coworkers, and usual work situations; and dealing with changes in a routine setting. See id.

Plaintiff's in situ cervical cancer occurred in 1998, more than 12 years before the alleged onset date. (T.313, 398, 468). At that time, Plaintiff had a LEEP procedure; her pap smears since have been normal. (Id.). Plaintiff has not alleged, nor does the

record show, that she had any abnormal sequelae from her cervical cancer. When she saw her OB/GYN in February of 2014, she had "no complaints," other than heavy menstrual periods. (T.468). Consultative physician Dr. Hongbao Liu did not assign any limitations due to this remote cancer. Rather, after examining Plaintiff, his only diagnosis was IBS, which he opined would result in "mild" limitations in routine activities. (T.400).

Plaintiff's foot neuroma was diagnosed in October 2006, again well before the alleged onset date. (T.308, 315). Despite this condition, Plaintiff continued to work full-time in a research lab until 2010, when her grant funding ended. During the disability period, she consistently worked 20 hours per week at the cigar shop, which required her to stock and clean (T.41), and therefore be on her feet. Plaintiff did not allege present difficulty standing or walking due to her foot neuroma. (T.252-53). For instance, she did not mention any complaints about her foot neuroma to Dr. Liu, who found that she had a normal gait and stance, could walk on her heels and toes, and had no sensory deficits or motor strength deficits. (T.399). There is no indication that her foot neuroma deteriorated during the relevant disability period, which undermines a finding that it was "severe" enough to cause any limitations in work-related functions. See Snell, 177 F.3d at 136.

Plaintiff also testified that she had arthritis in her right thumb since she had worked for Kodak in 1996. (T.49-50, 68). Again, Plaintiff continued to work until February 2010, when her research

grant funding expired. (T.42). Plaintiff admitted that she has not sought any treatment for her right-thumb arthritis. When asked how she knew she had arthritis, she responded that used her mother's arthritis cream and it helped. (T.68). See Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) ("[S]ubstantial record evidence indicated that Woodmancy either failed to pursue or to benefit from treatment for substance abuse but did benefit from treatment for the other conditions in ways that minimized their impairing effect.") (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (holding condition was not severe impairment where it improved after treatment)). Moreover, consultative physician Dr. Liu found that she had full grip strength in her hands as well as intact manual and finger dexterity, and he did did not assign any manipulative limitations. (T.400).

Plaintiff's ADHD, diagnosed in January of 2005, likewise did not prevent her from working full-time until the loss of her grant funding in February of 2010. (T.314, 335). Plaintiff did not mention ADHD to her healthcare providers in Rochester, and it was never included as a diagnosis by Dr. Shafiq, LMHC Pilato or any of her other providers at Unity Mental Health Services. Plaintiff did not mention it to consultative psychologist Dr. Ransom, who also did not include it as a diagnosis. The record also contains admissions by Plaintiff that she could finish what she started and that she read daily. (T.21 (citing Ex. 3E at 6, 9); T.251, 254).

The Court notes that Plaintiff did complain of general difficulties with concentration to Dr. Ransom. On examination, Plaintiff could count backwards from ten, but could only do 2 out of 3 simple calculations, and had difficulty with serial 3's. Based on this, Dr. Ransom opined that Plaintiff's "[a]ttention and concentration were moderately impaired" "by depression." (T.395-96). The ALJ's RFC assessment is not inconsistent with these "moderate" limitations assigned by Dr. Ransom; the ALJ restricted Plaintiff to unskilled (simple) work that required only occasional judgments, occasional changes, no assembly-line production, and no teamwork. (T.22).

Plaintiff has not established that her alleged PTSD was a "severe" impairment. As an initial matter, PTSD—unlike depressive disorder and anxiety disorder—was never a confirmed diagnosis by an "acceptable medical source," much less an "other source." Rather, on intake at Unity Mental Health Services, LCSW Wilson indicated PTSD as a "rule out" diagnosis. In all subsequent treatment notes by Plaintiff's therapists and psychiatrists, PTSD was listed as a "rule out" diagnosis. Even if Plaintiff had been diagnosed with PTSD, "severity" is not established based on a medical diagnosis or medical findings, standing alone. See SSR 85-28, 1985 WL 56856, at *4 ("A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) *and* an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to

perform basic work activities. . . ."); emphasis supplied. Plaintiff has not established that she had significant limitations in basic work-related functions specifically attributable to her alleged PTSD; thus, any error at step two in mentioning PTSD as a "severe" impairment was harmless. See Singleton v. Comm'r of Soc. Sec., No. 5:15-CV-1523(ATB), 2016 WL 6156000, at *8 (N.D.N.Y. Oct. 21, 2016) ("Even if the ALJ erred in this case in failing to mention the diagnosis of PTSD, it is clear that this impairment did not cause further limitations in the domains of functioning than were already considered by the ALJ.").

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's decision is not legally erroneous and is supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed. Defendant's motion for judgment on the pleadings is granted, and Plaintiff's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
    HON. MICHAEL A. TELESCA
    United States District Judge

Dated:    September 20, 2017
          Rochester, New York.